**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**


**CASE NO.   1210020-CR-MARTINEZ**


**UNITED STATES OF AMERICA**

**vs.**

**AMMON COVINO,**

                        **Defendant. /**
_____


**GOVERNMENT'S SENTENCING MEMORANDUM**


The United States of America hereby responds to that portion of Defendant Covino's Objections to the Presentence Investigation Report And Sentencing Memorandum [D.E.-93-2], dated November 15, 2013, which addresses sentencing, as distinct from the portion of defendant's pleading addressing objections directed to the Guideline calculations, which have been separately addressed in the Government's response to those objections [D.E.-97], and in response thereto would show:

**BACKGROUND**

Defendant stands convicted upon his plea of guilty to a single count of conspiracy stemming from his involvement in the illegal purchase and sale of fish/wildlife, in violation of the laws of the State of Florida and the federal Lacey Act, all in violation of Title 18, United States Code, Section 371. The Joint Factual Statement [D.E.-68], executed and submitted to the Court in support of the written Plea GREEMENT [D.E.-69] in this matter on September 24, 2013, contains the relevant facts establishing the criminal violation by defendant. The Revised

PSR [D.E.-93] concludes that defendant's properly calculated Guideline Range is Level 14, Criminal History Category I, in Zone D, and equates to an advisory Guideline Range of 15- 21 months. Subject to the Court's resolution of the two pending objections by defendant, this matter stands ready for sentencing.

## DISCUSSION

### 1. The Criminal Offense Conduct

Defendant was in the pre-eminent position at the Idaho Aquarium, Inc. (IAI) to assure that the business activities of the entity were properly executed. Instead, through self-dealing and flagrant violation of State and federal law, he and his co-conspirators enriched themselves and rendered the non-profit IAI criminally liable. Further, his efforts to protect himself from accountability, and to conceal on-going efforts at further criminal activity, he induced and persuaded his otherwise uninvolved nephew to engage in the obstruction of justice, as reflected in the decision and sentence in *United States v. Peter C. Covino, IV*, Case No. 13-10010-CR-MARTINEZ

1.      Contrary to the mis-informed views expressed in letters submitted on behalf of defendant - some relating back to his detention proceedings and pre-dating his entry of a guilty plea – there are not tapes, transcripts or evidence of other ilk demonstrating efforts by anyone to pressure Ammon Covino into violating Florida law regulating the take and sale of the species in this case. To the contrary, the Joint Factual Statement, and the evidence of the recorded conversations establish that defendant was not only warned regarding the requirements, but was actually supplied the necessary forms to seek proper authorization for the collection activities. His decision to short-cut the requirements of the law are best appreciated by reviewing his own

language regarding the requirements, as in D.E.-68 at ¶¶ 11, 16, when advised his source could not get permits for the desired wildlife, COVINO responded in part, "*No one's gonna know, dude, but me and you, man, if we do this . . . Just start doing it . . . Who gives a shit, man,?*" and it was "no big deal" that sharks being purchased for the IAI would have no valid permits.

2.       In his current pleading, without support of any kind, defendant would have the Court conclude he in some fashion relied upon "fish and wildlife officials in Idaho" from whom he received incorrect information. D.E.-93-2at 9 n.6. In fact, COVINO had expressed his view of the Idaho Department of Fish & Game to his Monroe County-based supplier in a conversation recorded on September 1, 2012, when he assured that it was "*no big deal*" that the spotted eagle rays being discussed lacked the requisite permits and asserted that "*We're not telling anybody*" and that all he needed in Idaho was a health certificate to show local authorities, who were "*about as dumb as a fricking bag of hair.*" There is not a scintilla of evidence to suggest defendant relied at any time on erroneous information provided by any law enforcement source, but rather he denigrated their abilities and expressed confidence in his own capacity to simply avoid and evade their oversight.

Defendant, despite his assertions, is not an atypical offender of the wildlife protection laws. States utilize their licensing and permitting regimes as management tools to identify pressures being placed on species of concern and as a mechanism for precluding harvest beyond the maximum sustainable yield. Sharks and rays, both members of the elasmobranch family of fish, are subject to careful regulation by the State of Florida in the Florida Administrative Code at Section 68B-44.008(1)(ee) which provides that no person shall harvest, possess, land, purchase, sell, or exchange any or any part of a spotted eagle ray (*Aetobatus narinari*) and Section

68B-44.008(1)(L) which provides that no person shall harvest, possess, land, purchase, sell, or exchange any or any part of a lemon shark (*Negaprion brevirostris*). To avoid that conservation-based prohibition Florida requires a Special Activities License to harvest, transport, or display for educational purposes any eagle ray or shark species. Defendant's comments claiming these species are not depleted in any way is thus belied by the letter of, and management practices of the State of Florida.

## 2.    The Criminal Obstruction Conduct

Defendant's conduct was not an impulsive reaction to discovering that his criminal conduct had been uncovered. He was arrested, offered and opportunity to discuss his case with agents, appeared in Court in the District of Idaho, and was provided a copy of the complaint against him, which provided a significant level of insight into his circumstances. Not until that evening did he contact his nephew on multiple occasions and solicit his effort to impeded justice. He induced Peter Covino, IV, to attempt to eliminate evidence against him that included payment records, invoices, shipping documents, and text messages discussing his illegal business transactions that had occurred in the past, where on-going, and that extended to business entities beyond just the IAI, to include the Portland Aquarium, in which defendant has admitted an ownership interest.. To now claim that the efforts, which necessarily included consultation between defendant and his nephew between the two calls to Florida, is illustrative of defendant's underlying character, and provides insight relevant to several of the factors recited in Title 18, United States Code, Section 3553(a).

## 3.  Family Circumstances

Defendant, on Motion and though multiple submission son his behalf describes at great

length his family circumstances and his perception of the likely impact of any custodial sentence. Further, he urges this court to engage in a downward departure from the advisory Sentencing Guideline range ultimately calculated in this matter, to insure that no period of incarceration is imposed. He relies for that purpose on Section 5H1.6 of the sentencing Guidelines, which he concedes on Motion was specifically amended in 2003 to limit the availability of such departures, and the Policy Statement of which clearly notes that for an offense such as in the instant case, " .   .   . family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."

In considering this request, the Court must necessarily consider as well the factors enunciated in the accompanying *Application Notes*, which expressly recognize that collateral impact, both financial and in terms of care-giving activity, invariably occurs in every instance where an advisory sentencing range calls for any period of incarceration. Indeed, the thrust of the notes and case law addressing the gamut of Section 5H characteristics is that the impact, to be cognizable, must exceed the harm "ordinarily incident to incarceration for a similarly situated defendant." *See, e.g.*, Section 5H1.6 App. Note 1(B)(ii).

While defendant has a large family, with commensurate responsibilities, it is not apparent that his responsibilities exceed in kind and quantum, those faced by a similarly situated defendant. Indeed, he may in fact be somewhat better off than most, because he has established by his pleadings that his extended family is geographically available to assist, are motivated to do so, and are strongly supportive.

In any attempt to take advantage of a downward departure, defendant bears the burden of establishing that he is so dissimilarly situated that he takes the benefit of Section 5H1.6. To

meet the standard of the Guidelines he would have to demonstrate that the impact under these standards "substantially excess" the similar harm suffered by other families when the bread-winner is incarcerated. Defendant has not done that.

The Court, even in the post-*Booker* era, is bound to apply the Guidelines in the three-step manner mandated by Section 1B1.1. After making all other decisions to properly calculate the advisory range, the Court then assesses the impact and effect of Parts H and K of Chapter Five. *See, e.g.*, Section 1B1.1(a) and (b). Thereafter, the mandates of the 18 U.S.C. § 3553(a) factors, taken as a whole come into play.

### 4. Statutory Factors

The factors enumerated in Title 18, United States Code, Section 3553 stand compellingly for the proposition that defendant's conduct warrants a period of incarceration. Defendant, largely through letters filed on his behalf has acquainted this Honorable Court with some of his personal characteristics and history. While the letters almost uniformly seek to minimize and excuse defendant's criminal conduct, they do not reflect in any significant way actual insight into the manner and the impact of his conduct as addressed by Section 3553(a)(1) - "the nature and circumstances of the offense."

The government is recommending a sentence that includes a period of incarceration, sufficient, but not beyond that necessary to effectuate the legitimate goals of sentencing. The government strongly believes that such a sentence is necessary to reasonably accomplish the sentencing goals of retribution, rehabilitation, incapacitation, and deterrence that the statutory factors seek to achieve. A lesser sentence would simply trivialize the wrongdoing, likely result in an unwarranted disparity in sentencing, and not serve to reduce the potential

for recidivism by the defendant and continued similar conduct by other similarly inclined offenders.

In *United States v. Pugh*, 515 F.3d 1179 (11th Cir. 2008), the Court engaged in a careful analysis of the factors in §3553(a), and in the context of that case found a probationary sentence substantively unreasonable. A subsequent, analogous result was reached in *United States v. Irey*, 612 F.3d 1160 (11th Cir. 2010), which also rejected a below-Guidelines sentence as substantively unreasonable. While the sentence durations and substantive facts are admittedly different from case to case, the general guidance provided by these cases is useful in the application of the sentencing factors. For example, following defendant's logic, he would have the court, by departure or variance, impose no incarceration at sentencing, relying on the latter portion of Section 3553(a)(1) – "the history and characteristics of the defendant." Such a result though, is manifestly unreasonable when viewed *in pari material* with Section 3553(a)(2).

COVINO's offense occurred in the context of an industry that is extraordinarily difficult to effectively police and which appears all to ready to cut corners and ignore legal requirements to secure additional resources. Even in cases involving a "non-profit" such as IAA, the financial benefits to the individuals clearly became a driving force behind extending and enlarging the facility and attracting new visitors. That economic benefit is readily apparent in the PSR analysis of the income to defendant upon the opening and operation of IAI. As in most white-collar crime, deterrence really takes only two forms – financial penalties and/or incarceration. Often, as here, a financial penalty is simply not available, and would truly work a more disproportionate harm on families than on the defendants

themselves.

The Eleventh Circuit has seen the need to focus greater attention on the issue of general deterrence in the context of white collar crime. In *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006), the decision took the trial court to task for focusing excessively on the individual deterrence factor and thereby failing "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Citing to the Senate Report, by the Congress that enacted Section 3553, the Court understood that deterrence was of particular concern to Congress in the area of white collar crime and recognized " . . . the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense . . . ." *Id.* The Senate Report specifically expressed the view that probation was too often imposed in white collar crime cases, with inadequate " . . . consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance." *Id.* The Court, in *Martin*, opined that economic and fraud-based crimes are "prime candidate[s] for general deterrence" because they are "more rational, cool, and calculated than sudden crimes of passion or opportunity." 455 F.3d at 1240 (citation omitted, alteration in original). If defendants convicted of fraud-based crimes receive variant sentences, with little or no incarceration, then the message to similarly-situated defendants "is that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *Id.* The principle of *Martin* is applicable with equal force in a resource violation case, where defendants are motivated by economic return and place the compliant members of the industry at an inordinate competitive disadvantage.

Defendant was convicted on his plea of guilty to a conspiracy to violate the Lacey Act.

Originally, criminal violations of the Lacey Act were only classified as misdemeanors.   In 1981,

however, concerned about the effectiveness of the Act, Congress increased the applicable

penalties in order to raise the priority of the cases and to encourage judges to impose greater

penalties.   As the Senate Report for the 1981 amendments explained:

> Although both of these acts [i.e., the Lacey Act and Black Bass
> Act] have been amended throughout the years, a number of
> problems have developed that have limited their effectiveness as
> wildlife law enforcement tools. *The penalties are too low*, and the
> culpability standard too stringent.   In addition, *because criminal
> violations are presently misdemeanors,* U.S. Attorneys are
> reluctant to give priority to these cases and *judges are reluctant to
> impose substantial penalties*.

*See* S. Rep. No. 97-123, at 2 (1981), *as reprinted in* 1981 U.S.C.C.A.N. 1748, 1749 (emphasis

added).   Congress therefore amended the Act to punish some violations as felonies and thereby

address these perceived problems.   *See* Lacey Act Amendments of 1981, Pub. L. No. 97-79, §

4(d)(1), 95 Stat. 1073, 1076 (codified as 16 U.S.C. § 3373(d)(1)); *see also United States v.

McNab*, 331 F.3d 1228, 1238 (11th Cir. 2003) (the legislative history reflects that "the [main]

thrust of Congress's intention in amending the Act was to expand its scope and enhance its

deterrence effect.")(footnote omitted) (quoting *United States v. 594,464 Pounds of Salmon*, 871

F.2d 824, 828 (9th Cir. 1989)); *see also Ewing v. California*, 538 U.S. 11, 29 (2003) (plurality

opinion) (noting that courts must "accord proper deference to the policy judgments that find

expression in the legislature's choice of sanctions"); *Blanton v. City of North Las Vegas*, 489 U.S.

9

538, 541 (1989).

Congress' action clearly addresses Subsections (A) and (B) of Section 3553(a)(2), since in the absence of the sense of Congress that Lacey Act violations were indeed a serious matter, no amendment to elevate such offenses from misdemeanors to felonies would have been necessary, and the linked concern of deterring such conduct would naturally arise from the amendments as well. The United States, recognizing that defendant's prior felony offense occurred some time ago, nevertheless lacks the confidence expressed in his Motion that recidivism is not a concern to be addressed by a sentence accounting for specific deterrence. Defendant's true attitude toward conservation laws generally and the authorities enforcing those laws is more accurately reflected in his unguarded, recorded statements prior to arrest than his carefully crafted mea culpa pending sentence. Defendant's demonstrated disdain for the law and its requirements suggest a serious need for this Honorable Court to "promote respect for the law, and to provide just punishment for the offense;" by bringing home to he and similarly inclined individuals that relying on family circumstances does not provide the proverbial "Get Out Of Jail Free" card.

Deterrence of both the defendant and others inclined to evade the laws intended to protect the marine resources of Florida and federal waters would be non-existent if all defendants were able to profit from their violations of the law, yet claim insulation from incarceration because of the collateral effect that might have on their families. While doubtless home confinement and supervisory status imposes some inconveniences on the individual undergoing those restrictions, they are largely invisible to the general public and the universe of potential violators. Indeed, in the total absence of an option to impose credible monetary penalties as part of an integrated

10

sentence, the only remaining tool to achieve specific and general deterrence is an appropriate period of incarceration.

<b><u>CONCLUSION</u></b>

Based on the foregoing discussion, the United States submits that pursuant to the advisory Sentencing Guidelines, the sentencing factors enumerated in Title 18, United States Code, Section 3553(a), and defendant's relevant conduct, including his considered decision to violate both the substantive laws as charged in the Indictment, and to direct his nephew in an effort to obstruct and impede the due administration of justice, as reflected in in *United States v. Peter C. Covino, IV*, Case No. 13-10010-CR-MARTINEZ, warrants a sentence of 21 months of custodial confinement, followed by a period of three years supervised release and the imposition of the general and special conditions of supervised release reflected in the Revised PSR. Additionally, the government respectfully urges this Honorable Court to impose a specific employment restriction during the period of supervised release precluding any involvement or employment by defendant in the ownership, operation, or management in the aquarium trade, whether non-profit or for profit entities.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:      Thomas A. Watts-FitzGerald
Assistant United States Attorney
Florida Bar No.   0273538
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961- 9413

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November ____27ᵗʰ____, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.


s/____Thomas A. Watts-FitzGerald_____
Assistant U.S. Attorney

## SERVICE LIST

**UNITED STATES v. AMMON COVINO,**
**CASE NO. ___12-10020-CR-MARTINEZ___**
**United States District Court, Southern District of Florida**

Bruce M. Lyons, Esq.
1301 E. Broward Blvd., Ste. 220
Ft. Lauderdale, FL 33301
Telephone:    954-467-8700
Attorney for Ammon Covino
Service by CM/ECF and U.S. Mail

Fred Haddad, Esq.
1 Financial Plaza, Ste. 2612
Ft. Lauderdale, FL 33394-0061
Telephone: 954-467-6767
Attorney for Idaho Aquarium, Inc.
Service by CM/ECF and U.S. Mail


Juan Carlos Antorcha, Esq.
Hilton Napoleon II, Esq.
283 Catalonia Avenue
Coral Gables, FL 33134
Telephone: 305-476-7105
Attorneys for Christopher Conk
Service by CM/ECF and U.S. Mail

Brett L. Tolman, Esq.
Eric G. Benson, Esq.
36 State Street, Suite 1400
Salt Lake City, UT 84111
Telephone: 801-532-1500
Attorneys for Christopher Conk
Service by CM/ECF and U.S. Mail